## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JUSTIN ANAYA,

      **Plaintiff,**

      **v.**                            **CASE NO.  25-3122-JWL**

**(fnu) HUDSON, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER
## TO SHOW CAUSE

Plaintiff Justin Anaya is hereby required to show good cause, in writing to the undersigned, why this action should not be dismissed due to the deficiencies in Plaintiff's Complaint that are discussed herein.

### I.  Nature of the Matter Before the Court

Plaintiff, a federal prisoner, brings this pro se civil rights action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiff is currently being held at FCI-Beckley in Beaver, West Virginia, but his claims arose during his detention at FCI-Leavenworth in Leavenworth, Kansas ("FCIL").  Plaintiff has been granted leave to proceed in forma pauperis.  (Doc. 5.)

Plaintiff alleges that he was repeatedly subjected to excessive force, denied medical attention, and otherwise mistreated at FCIL the entire time he was housed there.  The Complaint (Doc. 1) contains detailed factual allegations, which are summarized as follows:

On March 29, 2023, Defendant Rockhold and John Doe #2 shoved Plaintiff's face into the ground without cause, then took him to the SHU even though he did nothing wrong and received no disciplinary report.  Rockhold then used additional force against Plaintiff, punching him and

choking him until he blacked out. Plaintiff was awakened when Rockhold and John Doe #3 lifted him off the ground by his handcuffs.

Later on March 29, Plaintiff was taken to the lieutenant's office while restrained. He explained he had done nothing wrong. While there, Plaintiff asked to use the restroom as it had been six hours since his last use. He was refused permission, so Plaintiff "slipped the chains off" and attempted to use the restroom in the office. He received a disciplinary report for removing his chains without permission. He was later found guilty of a disciplinary infraction.

Still later on March 29, Plaintiff was returned to the holding cell. He requested medical attention for a busted lip, knots on his head, and severe body pain. Medical staff assessed Plaintiff but "didn't take his complaint serious" because staff said he was lying. Plaintiff was put into a cell with no extra clothing, blankets, sheets, toilet paper, or linens. Plaintiff complained that the cell had dried blood on the bunk, feces in the toilet, and the water did not work. He was given a thin layer of foam to sleep on, which was dirty. Plaintiff asked for a mattress, food, and cleaning supplies from John Doe #4 but was denied. Due to the lack of clothes, Plaintiff sustained injuries to his feet, hands, ears, and face because his cell was cold.

On March 30, 2023, Plaintiff did not receive breakfast or lunch. This meant he had missed three meals. Plaintiff attempted to get a supervisor's attention for assistance by hiding in the shower until someone came looking for him. John Does #6, 7, 8, and 9 took him to another holding cell. They also took his clothing and slippers. When Plaintiff flushed the toilet, the cell flooded. Nothing was done. He then covered the door window, again to try to get attention and assistance. Plaintiff did not receive the next meal. He expressed suicidal plans to John Doe #9 but was ignored.

Later that night, he made a noose out of his paper boxes and tried to hang himself. Plaintiff was placed on suicide watch with no food or water. He was left in paper underwear without a blanket or mattress for the night.

Plaintiff was visited by a staff psychiatrist the next day, March 31, 2023, but Plaintiff told him to "leave and never return" when the doctor disbelieved Plaintiff's allegations. Three officers came to the door of Plaintiff's cell and instructed him to put his face up to the food slot. They sprayed Plaintiff in the face with pepper spray. He fell back, hitting his head on the concrete floor and blacking out. When he was awakened by the officers trying to cuff him, he started coughing and vomiting. He asked to go to Medical and was initially refused but later made to walk with his head between his legs to Medical. He was not decontaminated. Plaintiff was then put in overly tight ambulatory restraints. He remained restrained for over 24 hours with no food, water, or bathroom breaks.

A staff psychiatrist visited Plaintiff again on April 1, 2023. According to Plaintiff, records from the visit indicate Plaintiff voiced threats against staff.

On April 2, 2023, Plaintiff was put in a holding cell that "mysteriously" contained objects that could be used for self-harm. Plaintiff attempted to injure himself with a piece of sharp wood and later by swallowing a piece of metal. He also cut himself in order to prove he was having "command hallucinations."

On April 4, 2023, Plaintiff broke the plexiglass tray slot in his cell "in order to get defendants to change his cell due to unlivable conditions." After the psychiatrist got involved, Plaintiff was moved to another cell where conditions were no better. At this point, Plaintiff had been denied a shower for days. The psychiatrist noted that Plaintiff's hygiene was extremely poor.

Staff claimed Plaintiff had been offered a shower but refused.  Plaintiff was given an injection of some medication after being told he would be put in hard restraints if he refused.

On April 6, 2023, Plaintiff was seen by a different psychiatrist, Dr. Abbott.  Plaintiff reported suffering torture to her, but she "assumed Plaintiff was fabricating a story."

On April 7, 2023, Plaintiff was seen by Medical and told he would get a shower if he took an injection of medication.  Plaintiff agreed and was given a shower.  He was moved to a different cell that had a clogged toilet and flooded when flushed.  When he was refused assistance, Plaintiff again broke the plexiglass tray and cut his thumb, requiring stitches.  He was given two more injections.

On April 8, 2023, Plaintiff was visited by the first psychiatrist.  He reported smoking K2 all week, which staff had told him to say, but Plaintiff asserts that the doctor should have known it was a lie since he had been on suicide watch the whole time.

On April 9, 2023, Plaintiff was sprayed with pepper spray through the food slot for no apparent reason.  He yelled that he was filing grievances against all the officers.  They took his smock and gave him paper pants.  Even though he was compliant, they put him in ambulatory restraints, yelling, "You will learn about Leavenworth!"  Officer Hoad claimed Plaintiff had spit on him.  He remained in restraints all night and was denied food, water, or use of a toilet.

On April 10, 2023, Plaintiff was moved back to suicide watch and again sprayed with pepper spray through the food slot while still retrained.  He was then returned to the SHU without decontamination.  He was left in restraints until April 12, 2023, and remained on suicide watch until April 20, 2023.  He was returned to suicide watch on April 23, 2023, after again trying to hang himself.

On April 24, 2023, John Does #27 and 28 took Plaintiff off suicide watch and told Plaintiff to kill himself. He was given one meal a day and repeatedly told to hang himself for the next three days.

On May 1, 2023, two defendants came into Plaintiff's cell. They pushed, slapped, and punched him, forcing him to his knees and yelling, "You will learn about Leavenworth one way or another." He was cuffed behind his back. An officer grabbed his genitals and buttocks and yelled, "Cavity check!" The officer conducted the check and squeezed Plaintiff's testicles causing him extreme pain. Plaintiff dove out of the cell to try to make sure he got on camera. He was taken to the SHU. Plaintiff filed a PREA complaint against the defendants despite being threatened that he would be killed if he reported the incident. Plaintiff was assessed by Medical, and SIS investigated the incident.

From May 1 through May 10, 2023, Plaintiff received only one meal a day and was harassed by staff and called a snitch or a sex offender to other inmates.

On May 10, 2023, the warden conducted a walk-through, and Plaintiff reported "everything" about the defendants' illegal conduct. Thirty minutes later, six officers arrived with a video camera at Plaintiff's cell and directed him to submit to restraints. Plaintiff submitted to hand restraints, but Defendant Hoad kept yelling, "Anaya, stop resisting!" as the officers used force against him. He was taken to a different cell and strapped to concrete block restraints. John Doe #32 spit and drooled onto his face while the other defendants laughed. Another defendant grabbed Plaintiff's genitals. They swiped something wet between his legs that immediately started burning and stinging. Plaintiff was left in restraints.

Later on May 10, Rockhold and another officer came into the cell. Rockhold began to choke Plaintiff, yelling, "You better stop asking for those administrative remedies!" The other

officer yanked the chains on Plaintiff's feet causing lacerations. Plaintiff was left in restraints and denied food, fluids, or use of a bathroom.

On May 11, 2023, three officers arrived, and Defendant Cruz asked Plaintiff if he had learned his lesson. Plaintiff screamed that he was going to report them all. Later, Plaintiff was switched to new restraints by John Doe #38, who said, "That's how you 4 point somebody." He told Plaintiff he looked like "Jesus on the cross." Rockhold removed Plaintiff from the four-point restraints to hand restraints at some point.

Later, Rockhold and another officer arrived to do a restraint check. Rockhold rushed Plaintiff with a riot shield while punching and kicking him. Plaintiff passed out and awoke to the defendants wiping something wet between his legs that caused burning and extreme pain. Hours later, Rockhold returned and again rushed Plaintiff, repeatedly punched him in the face, and subjected him to the genital wipe. Plaintiff yelled "with everything he had in him," and the defendants left.

On May 12, 2023, Plaintiff received breakfast for the first time in weeks and was given a shower. However, Rockhold assaulted Plaintiff in the shower. Plaintiff asked to see the psychiatrist but was refused. He "busted his head wide open" to get medical and psychiatric attention and to get out of restraints. He was seen by Dr. Kerivan and put on suicide watch. Dr. Kerivan noted seeing Plaintiff with a black eye and swollen feet and hands. He also requested that Plaintiff be given a shower. Plaintiff was not offered a shower.

On May 14, 2023, Plaintiff again saw Dr. Kerivan. She asked if he refused a shower, and he said no one had offered him one.

On May 15, 2023, Plaintiff heard voices telling him to break the plexiglass and cut himself in the chest. He did this and, despite turning over the glass when instructed, was sprayed in the

face with pepper spray, rushed by officers, and put into ambulatory restraints.  On the way to the gym, he was beaten and choked by officers.  He was not decontaminated and was told by John Doe #40 to run in circles until he cooled off.  In an incident report, Defendant Kline said Plaintiff had been swinging the plexiglass at him.  At the disciplinary hearing, Plaintiff's request for video of the incident was denied, and he was found guilty.

On May 22, 2023, Plaintiff was taken off suicide watch and to a holding cell.  On the way, Rockhold threatened Plaintiff.  He was denied clothing and left in the holding cell all night.  The next day, he was denied breakfast and a clothing change.  Officer McBride said that since Plaintiff like to assault staff, she didn't have to feed him or given him clothing.  His cell was repeatedly flooded with dirty water from neighboring cells' overflowing toilets, and Plaintiff was denied cleaning supplies.

On July 10, 2023, Plaintiff was found guilty at a disciplinary hearing of most of the infractions from April through May, 2023.

The Complaint contains no specific allegations of misconduct after May 22, 2023.  Plaintiff states, "All the way until October of 2023, plaintiff was still denied medical attention, his complaints not taken seriously, and plaintiff was constantly threatened by these same defendants." (Doc. 1, at 19.)

Plaintiff alleges that he suffered long-lasting problems with his breathing and his mental health, as well as intense headaches and severe episodes of pain in his neck, back, body, and limbs. He asserts that he never had mental health problems until the incidents starting on March 29, 2023.

Plaintiff names 64 defendants, all staff at FCIL.  Plaintiff seeks relief in the form of $20 million or $10 million and immediate release.  He states that he has exhausted all available administrative remedies.

## II.  Legal Standards

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1)– (2).

A court liberally construes a pro se complaint and applies "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In addition, the court accepts all well-pleaded allegations in the complaint as true. *Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006).  On the other hand, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is appropriate. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted).  The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

The Tenth Circuit Court of Appeals has explained "that, to state a claim in federal court, a complaint must explain what each defendant did to [the pro se plaintiff]; when the defendant did it; how the defendant's action harmed [the plaintiff]; and, what specific legal right the plaintiff

believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citation omitted).

The Tenth Circuit has pointed out that the Supreme Court's decisions in *Twombly* and *Erickson* gave rise to a new standard of review for § 1915(e)(2)(B)(ii) dismissals. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (citations omitted); *see also Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). As a result, courts "look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief." *Kay*, 500 F.3d at 1218 (citation omitted). Under this new standard, "a plaintiff must 'nudge his claims across the line from conceivable to plausible.'" *Smith*, 561 F.3d at 1098 (citation omitted). "Plausible" in this context does not mean "likely to be true," but rather refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent," then the plaintiff has not "nudged [his] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Twombly*, 127 S. Ct. at 1974).

## III. DISCUSSION

The Complaint is subject to dismissal for the following reasons.

### A. Statute of Limitations

Plaintiff brings claims based on incidents occurring between March 29, 2023, and October of 2023. However, he only includes specific allegations of misconduct for the period from March 29 to May 22, 2023. He then states, "All the way until October of 2023, plaintiff was still denied medical attention, his complaints were not taken seriously, and plaintiff was constantly threatened

by these same defendants." (Doc. 1, at 19.).

"A *Bivens* action is subject to the same statute of limitations as a 42 U.S.C. § 1983 suit." *Roberts v. Barreras*, 109 F. App'x 224, n.1 (10th Cir. 2004) (citation omitted). The statute of limitations applicable to § 1983 actions is determined from looking at the appropriate state statute of limitations and tolling principles. *See Hardin v. Straub*, 490 U.S. 536, 539 (1989).

"The forum state's statute of limitations for personal injury actions governs civil rights claims under both 42 U.S.C. § 1981 and § 1983. . . . In Kansas, that is the two-year statute of limitations in Kan. Stat. Ann. § 60–513(a)." *Brown v. Unified Sch. Dist. 501, Topeka Pub. Sch.*, 465 F.3d 1184, 1188 (10th Cir. 2006) (citations omitted).

While state law governs the length of the limitations period and tolling issues, "the accrual date of a § 1983 cause of action is a question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under federal law, the claim accrues "when the plaintiff has a complete and present cause of action." *Id.* (internal quotation marks and citation omitted). In other words, "[a] § 1983 action accrues when facts that would support a cause of action are or should be apparent." *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006) (internal quotation marks and citation omitted), *cert. denied* 549 U.S. 1059 (2006). A district court may dismiss a complaint filed by an indigent plaintiff if it is patently clear from the allegations as tendered that the action is barred by the statute of limitations. *Id.* at 1258–59; *see also Jones v. Bock*, 549 U.S. 199, 214 (2007); *Hawkins v. Lemons*, No. 09-3116-SAC, 2009 WL 2475130, at *2 (D. Kan. Aug. 12, 2009).

It plainly appears from the face of the Complaint that many of Plaintiff's claims are subject to dismissal as barred by the applicable two-year statute of limitations. Plaintiff's Complaint was mailed on June 25, 2025, and filed on July 2, 2025. The majority of Plaintiff's alleged violations occurred before June 25, 2023. Any events or acts of Defendants taken in connection with

10

Plaintiff's claims prior to June 25, 2023, took place more than two years prior to the filing of Plaintiff's Complaint and are time-barred. *See Fratus v. Deland*, 49 F.3d 673, 674–75 (10th Cir. 1995) (district court may consider affirmative defenses *sua sponte* when the defense is obvious from the face of the complaint and no further factual record is required to be developed).

The only allegations in the Complaint that fall within the limitations period are as follows:

> 300.  On July 6 or 7 of 2023, plaintiff emailed the warden addressing all the above.
>
> 301.  On 7/5/23, plaintiff spoke with Dr. Carpenter about all the events with staff wrongful acts, and plaintiff was notified that this defendant would look into his complaints.
>
> 302.  This same staff member also reference, different defendants been lying to psychology about plaintiff having a cellmate, when in fact, plaintiff was left in cell by himself against psychology orders and BOP policy.
>
> 303.  Camera footage can easily prove he never had a cellmate.
>
> 304.  On 7/10/23, plaintiff was illegally found guilty of most of the infractions from April through May of 2023, in which facts was fabricated by defendants. . . .
>
> 309.  All the way until October of 2023, plaintiff was still denied medical attention, his complaints not taken seriously, and plaintiff was constantly threatened by these same defendants.

(Doc. 1, at 19.)

These allegations either do not allege a constitutional violation or are too vague to state an actionable claim. Moreover, Plaintiff has not alleged facts suggesting that he would be entitled to statutory or equitable tolling of the statute of limitations. Plaintiff will be given an opportunity to show good cause why his Complaint should not be dismissed as barred by the statute of limitations.

**B.  No *Bivens* remedy**

Even if Plaintiff could overcome the limitations bar, a more fundamental problem is that he does not have a remedy under *Bivens*.

The U.S. Supreme Court has permitted, in extremely limited circumstances, a damages claim against a federal officer in his individual capacity for a deprivation of constitutional civil rights.  *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("In *Bivens* - proceeding on the theory that a right suggests a remedy – [the United States Supreme] Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'") (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 68 (2001)).  To state a *Bivens* claim, a plaintiff must allege the violation of a constitutional right by a federal officer acting under color of federal authority.  *Bivens*, 403 U.S. at 389.

In *Bivens*, the Supreme Court "held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures" under the Fourth Amendment.  *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017).  Since *Bivens*, the Supreme Court has recognized a *Bivens* remedy in *only two* other cases: *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980).

The Supreme Court has made it clear that expanding the *Bivens* remedy beyond the already recognized contexts is a "disfavored judicial activity." *Abbasi*, 582 U.S. at 135 (quotations omitted).  Therefore, a plaintiff may proceed on a *Bivens* action only if the Court determines the action survives a two-part inquiry.  First, the Court must determine whether the claim arises under a new *Bivens* context.  If not, the claim may be brought under *Bivens*.  However, if the claim

12

involves a new context, the Court may create a new *Bivens* remedy only if there are no special factors counseling hesitation against the creation of such a remedy. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

As to the first part of the inquiry, the test is whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the United States Supreme] Court[.]" *Abbasi*, 582 U.S. at 139. In other words, courts should determine whether the claims at issue differ meaningfully from "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary [based on her gender]; and a claim against prison officials for failure to treat an inmate's asthma [resulting in his death]." *Id.* at 140. Therefore, it is not merely a question of whether a plaintiff's claim arises under the Fourth, Fifth, or Eighth Amendment. "A claim may arise in a new [*Bivens*] context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez v. Mesa*, 589 U.S. 93, 103 (2020).

Plaintiff has not shown that a *Bivens* remedy is available for his claim. The Tenth Circuit recently noted that the Supreme Court "is on course to treating *Bivens* as a relic of the 20th century" and that "[t]his development has been gradual, but relentless." *Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1355 (10th Cir. 2024), *rehr'g denied* (Apr. 5, 2024). The Tenth Circuit in *Logsdon* found that:

> Without explicitly overruling its three acknowledged precedents, the [Supreme] Court has shown an increasing willingness to distinguish them, now stating that the ultimate question to ask when determining whether the courts should recognize a *Bivens* cause of action not created by Congress is ordinarily only "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert v. Boule*, 596 U.S. 482, 492, 142 S. Ct. 1793, 213 L.Ed.2d 54 (2022). And the circumstances in which the answer to the question is "no" appears to comprise a null set. *See id.* at 503, 142 S. Ct. 1793. (Gorsuch, J., concurring) ("When might a

13

court *ever* be 'better equipped' than the people's elected
representatives to weigh the 'costs and benefits' of creating a cause
of action? It seems to me that to ask the question is to answer it. To
create a new cause of action is to assign new private rights and
liabilities—a power that is in every meaningful sense an act of
legislation."); *see also Silva v. United States*, 45 F.4th 1134, 1140
(10th Cir. 2022) ("[W]e are left in no doubt that expanding *Bivens*
is not just 'a disfavored judicial activity,' it is an action that is
impermissible in virtually all circumstances." (quoting *Egbert*, 596
U.S. at 491, 142 S. Ct. 1793) (citation omitted)). The Court has said
in effect that almost any difference between the case at hand and the
three Court precedents can justify rejecting a cause of action. *See
Egbert,* 596 U.S. at 503, 142 S. Ct. 1793 (Gorsuch, J., concurring)
("Candidly, I struggle to see how this set of facts differs
meaningfully from those in *Bivens* itself.").

And, perhaps even more striking, the Court has justified a departure
from those precedents even when the facts are virtually the same if
the government can provide a reason for not recognizing a cause of
action that was not considered in the applicable precedent. Thus, in
*Egbert* itself the Court considered an excessive-force claim, similar
to the one in *Bivens*, against a federal officer. *See Egbert*, 596 U.S.
at 495, 142 S. Ct. 1793 ("*Bivens* and this case do involve similar
allegations of excessive force and thus arguably present almost
parallel circumstances or a similar mechanism of injury." (internal
quotation marks omitted)). But it held that the court of appeals erred
by recognizing a cause of action under *Bivens*, distinguishing *Bivens*
based on facts that have no bearing on the elements of an excessive-
force claim: the incident arose in the "border-security context," and
Congress had created remedies for misconduct by government
agents. *See id.* at 494, 142 S. Ct. 1793. Given such hurdles placed in
the way of a *Bivens* cause of action, Mr. Logsdon has no claim.

*Id*. at 1355–56.

The Tenth Circuit in *Logsdon* found that "[a] second independent ground for not

recognizing a *Bivens* action . . . is that the availability of alternative remedies for misconduct . . .

suggests that this court should not be the institution to create a remedy." *Id.* at 1359. "If there are

alternative remedial structures in place, that alone, like any special factor, is reason enough to limit

the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* (quoting *Egbert*, 596 U.S. at

493).  The Tenth Circuit quoted *Egbert* as follows:

> "So long as Congress or the Executive has created a remedial
> process that it finds sufficient to secure an adequate level of
> deterrence, the courts cannot second-guess that calibration by
> superimposing a *Bivens* remedy. That is true even if a court
> independently concludes that the Government's procedures are not
> as effective as an individual damages remedy." *Id.* at 498, 142 S. Ct.
> 1793 (internal quotation marks omitted).

*Id.*

In *Silva*, the Tenth Circuit held that the Bureau of Prison's Administrative Remedy

Program ("ARP") was adequate.  *Silva v. United States*, 45 F.4th 1134, 1141 (10th Cir. 2022)

(finding that the key takeaway from *Egbert* is "that courts may dispose of *Bivens* claims for 'two

*independent* reasons: Congress is better positioned to create remedies in the [context considered

by the court], and the Government already has provided alternative remedies that protect

plaintiffs") (citation omitted); *see also Noe v. United States Gov't*, 2023 WL 8868491, at *3 (10th

Cir. Dec. 22, 2023) ("We need not decide whether Noe's case is meaningfully different from

*Carlson*, because in the wake of *Egbert* and *Silva* . . . the availability of the ARP is sufficient to

foreclose a *Bivens* claim despite any factual similarity between the two.").

In *Silva*, the Tenth Circuit had little difficulty in concluding "that the BOP Administrative

Remedy Program is an adequate 'means through which allegedly unconstitutional actions . . . can

be brought to the attention of the BOP and prevented from recurring.'"  *Silva*, 45 F.4th at 1141

(citation omitted).  The *Silva* court found that "because *Bivens* 'is concerned solely with deterring

the unconstitutional acts of individual officers,'. . . the availability of the BOP's Administrative

Remedy Program offers an independently sufficient ground to foreclose Plaintiff's *Bivens* claim."

*Id.* (citing *Egbert*, 596 U.S. at 498 (quoting *Malesko*, 534 U.S. at 71)).

Based on the reasoning set forth in the recent Tenth Circuit opinions cited above, the Court finds that Plaintiff fails to state a claim for relief under *Bivens*.

**IV.  Response Required**

Plaintiff is required to show good cause why his Complaint should not be dismissed for the reasons stated herein.  Failure to respond by the deadline may result in dismissal of this matter without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **October 2, 2025,** in which to show good cause, in writing to the undersigned, why Plaintiff's Complaint should not be dismissed for the reasons stated herein.

**IT IS SO ORDERED**.

**Dated September 2, 2025, in Kansas City, Kansas.**

<u>**S/  John W. Lungstrum**</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**

16